CLERK'S OFFICE U.S. DIST. COURT
AT ROANOKE, VA
FILED
FEB 1 3 2008
JOHN F. CORCORAN, CLERK
BY:
DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION

| | |
|---|---|
| WANDA J. PRIM,<br>    Plaintiff, | )<br>)<br>) Civil Action No. 7:07cv213 |
| v. | )<br>) |
| MICHAEL J. ASTRUE,<br>COMMISSIONER OF SOCIAL SECURITY<br>    Defendant. | ) By: Hon. Michael F. Urbanski<br>)     United States Magistrate Judge<br>) |

## MEMORANDUM OPINION

Plaintiff Wanda J. Prim ("Prim") brought this action for review of the Commissioner of Social Security's ("Commissioner") decision to deny her application for disability insurance benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. §§ 401-433 ("Act").

Prim applied for benefits alleging onset of disability as of December 12, 2004, due to multiple impairments, principally involving a gastrointestinal disorder (uncontrollable diarrhea), headaches, bipolar disorder and depression. Prim's application was denied administratively, and she appealed the denial to an Administrative Law Judge ("ALJ"), who held a hearing on June 20, 2006. On August 18, 2006, the ALJ issued a decision finding that Prim had severe impairments of depression and an intestinal disorder that limited her ability to perform complex detailed tasks and her ability to perform heavy lifting. (Administrative Record [hereinafter "R."] at 24) Nevertheless, the ALJ determined that Prim could return to her past relevant work as a powder helper at a munitions plant, (R. 26), and denied her application for benefits. The Appeals Council denied Prim's request for review on February 21, 2007, rendering the decision final. This appeal followed.

Both parties have filed motions for summary judgment. Having reviewed the administrative record, and after briefing and oral argument, the decision of the Administrative

Law Judge ("ALJ") is affirmed in part and reversed and remanded in part. While the ALJ appears to have appropriately considered Prim's physical impairments, the ALJ did not meet the requirements of Social Security Ruling ("SSR") 82-62 in assessing whether Prim's mental impairments would allow her to return to her past relevant work. This case will be remanded for a proper assessment of whether Prim's mental impairment is compatible with the performance of her past relevant work as a powder helper in a munitions plant.

I.

The court may neither undertake a de novo review of the Commissioner's decision nor reweigh the evidence of record. Hunter v. Sullivan, 993 F.2d 31, 34 (4th Cir. 1992). Judicial review of disability cases is limited to determining whether substantial evidence supports the Commissioner's conclusion that the plaintiff failed to satisfy the Act's entitlement conditions. See Laws v. Celebrezze, 368 F.2d 640, 642 (4th Cir. 1966). Evidence is substantial when, considering the record as a whole, it might be deemed adequate to support a conclusion by a reasonable mind, Richardson v. Perales, 402 U.S. 389, 401 (1971), or when it would be sufficient to refuse a directed verdict in a jury trial. Smith v. Chater, 99 F.3d 635, 638 (4th Cir. 1996). Substantial evidence is not a "large or considerable amount of evidence," Pierce v. Underwood, 487 U.S. 552, 565 (1988), but is more than a mere scintilla and somewhat less than a preponderance. Perales, 402 U.S. at 401. If the Commissioner's decision is supported by substantial evidence, it must be affirmed. 42 U.S.C. § 405(g); Perales, 402 U.S. at 401.

The Commissioner employs a five-step process to evaluate DIB and SSI claims. 20 C.F.R. §§ 404.1520, 416.920; see also Heckler v. Campbell, 461 U.S. 458, 460-462 (1983). The Commissioner considers, in order, whether the claimant (1) is working; (2) has a severe impairment; (3) has an impairment that meets or equals the requirements of a listed impairment;

(4) can return to his or her past relevant work; and (5) if not, whether he or she can perform other work. Id. If the Commissioner conclusively finds the claimant "disabled" or "not disabled" at any point in the five-step process, he does not proceed to the next step. Id. Once the claimant has established a prima facie case for disability, the burden then shifts to the Commissioner to establish that the claimant maintains the residual functional capacity ("RFC"), considering the claimant's age, education, work experience, and impairments, to perform alternative work that exists in the national economy. 42 U.S.C. § 423(d)(2)(A); Taylor v. Weinberger, 512 F.2d 664, 666 (4th Cir. 1975).

## II.

Prim was born on February 13, 1961, graduated from high school and obtained a certificate as a certified nursing assistant. She served in the Army reserves for two years, and worked for many years as a nursing assistant, a line worker in a brake factory, a security guard in a warehouse and most recently in the powder helper capacity. (R. 86-93, 247-48) Prim indicated that she lost her most recent nursing assistant position as the facility closed. At the administrative hearing, Prim testified that she was fired from both the brake factory and munitions plant jobs because she spent so much time running back and forth to the bathroom. (R. 228-30) In certain of her medical records, however, Prim stated that she was fired from the powder helper job because she had to miss work to care for her ailing father. (R. 161)

From a physical standpoint, Prim alleges only one impairment found to be severe by the ALJ, her intestinal disorder. Prim testified that she suffers from embarrassing bouts of diarrhea. Prim indicates that her diarrhea was so severe that she wore adult diapers and had to run to the bathroom many times each day. She indicated that she cannot control her bowels such that she cannot always make it to the bathroom, causing her not to want to leave her home. (R. 124)

3

While the ALJ found this impairment to be severe, he did not find it to be disabling because Prim's medical records contain almost no mention of this ailment.

The record reflects that Prim has reported a great deal of stress in her life, including stress associated with marital problems, caring for her elderly and infirm father, problems with her children, caring for her grandchildren and other such issues creating extraordinary tension in her household. Prim described feeling overwhelmed and stressed, and reported that she had made some attempts at suicide by closing her eyes while driving. (R. 164) Prim was seen by several health care providers for her mental health issues and was hospitalized briefly at Carilion St. Albans Behavioral Health unit in 2005. Prim also spent some time at the Women's Resource Center of the New River Valley in 2004 following an episode where she broke out all of the windows of her trailer. (R. 195, 203)

Prim argues that the ALJ's decision is not supported by substantial evidence because the ALJ did not properly develop the record as to her physical impairment. In particular, Prim argues that the administrative record reflects no medical review of Prim's physical complaints. While a mental residual functional capacity ("RFC") assessment was performed, no state agency review was done of her intestinal disorder. Prim argues further that the ALJ determined Prim's intestinal disorder to be a severe impairment, but the hypothetical question given to the vocational expert ("VE") contained no physical restrictions. (R. 24, 248) The Commissioner argues that the ALJ correctly noted that Prim rarely complained of intestinal problems to her health care providers, aptly concluding that "if she was suffering from bouts of diarrhea, as frequently as alleged, the medical records would make some mention of this problem." (R. 26)[1]

---

[1] While that observation is sound, the ALJ then proceeds to state "[f]urthermore, at the hearing, she testified that she was eating a lot of fruit, which could very well account for her diarrhea." (R. 26) The ALJ's surmise in this regard is neither factually supported or administratively appropriate. While Prim did state that she eats a lot of fruit such as
(continued...)

4

As regards Prim's mental condition, Prim argues that the ALJ's decision does not contain any indication of the weight given to the psychologists and counselors who treated her for her bipolar condition, depression and anxiety nor does it meet the requirements of SSR 82-62, which requires that a decision maker carefully assess "the particular job duties which are likely to produce tension and anxiety . . . in order to determine if the claimant's mental impairment is compatible with the performance of such work." The Commissioner responds that the text of a Psychological Evaluation Report done by Robert W. Smith, Ph.D., on July 12, 2005 and a Mental Residual Functional Capacity Assessment done by E. Hugh Tenison, Ph.D., on September 12, 2005, do not reflect functional limitations precluding Prim's ability to perform her past relevant work. Moreover, the Commissioner argues that SSR 82-62 is met because the VE opinion that Prim could perform her past relevant work was based on a hypothetical question expressly incorporating Dr. Tenison's RFC assessment and the VE's knowledge of the jobs previously done by Prim.

After reviewing the administrative transcript, considering the briefs and oral argument, and considering the standard of review in social security disability appeals, the decision of the Commissioner must be reversed and the case remanded to the Commissioner for further administrative development.

---

[1](...continued)
watermelon, she testified that she had only done so for a month or so. (R. 243-44) More to the point, however, the ALJ appears to be making his own off the cuff diagnosis and medical judgment about the cause of Prim's abdominal distress without any supporting medical evidence in the record as there is no medical record in Prim's history that contains such a diagnosis by a health care provider. Prim testified that none of her doctors ever indicated that her fruit consumption could be the cause of her intestinal problems. (R. 243-44)

5

## III.

While Prim contends that she suffers from severe intestinal distress and diarrhea, causing problems with her ability to work due to frequent trips to the restroom, her medical records make only scant reference to such gastrointestinal urgency. To be sure, the checklist completed by Nancy O'Neill, a family nurse practitioner at the Free Clinic of Pulaski County on July 6, 2007, a few weeks after the administrative hearing, parrots her extreme complaints and indicates that she suffers from as many as 5 to 6 bouts of sudden diarrhea per day requiring her to visit the restroom for 10 to 15 minutes at a time and occasionally change clothes. FNP O'Neill estimated that Prim would miss more than four days a month due to this impairment. (R. 208)

The ALJ chose not to credit this checklist, largely because the severity of the symptoms reported there are not reflected in Prim's medical records. Indeed, in the seven years of medical records contained in the file, Prim complains of diarrhea on only two occasions. Of Prim's seventeen visits to the Pulaski Free Clinic, most of which were in 2005 and 2006, only one references vomiting and diarrhea, and it notes that Prim was feeling better. (R. 210) Plainly, there is support in the record for the ALJ's conclusion that FNP O'Neill's checklist assessment of the severity of Prim's diarrhea was not borne out by Prim's medical records from Prim's visits to the Pulaski Free Clinic. On May 23, 1005, Prim was seen by Dr. Kenneth R. Pendergrast, an internal medicine specialist for complaints of diarrhea. Dr. Pendergrast noted that "[s]he has been having problems with diarrhea, but she is not taking her Questran. The diarrhea started when she had her gallbladder out. The Questran helped but she says she cannot afford it." (R. 149) Dr. Pendergrast refined her medications and "recommended that she go ahead and get the Questran." (R. 149) There are no other notes from Dr. Pendergrast in the administrative record, although a reference to his earlier treatment of her for "fecal incontinence," (R. 145),

6

appears in a note from Dr. Andrew R. Dow, a psychiatrist who saw Prim in 2004 on referral from Dr. Pendergrast. There are no other treatment notes in the record for abdominal distress, and no notes that reflect the severity of the problem testified to by Prim and reflected in FNP O'Neill's checklist assessment. As a result, there is substantial evidence to support the ALJ's decision not to credit the checklist and find Prim disabled as a result of her physical problem.

## IV.

The functional limitations associated with Prim's mental condition is a much more clouded picture. Dr. Dow, who first saw Prim in the summer of 2004 while she was working at the munitions plant, does not identify any functional limitations associated with her mental health. Instead, his notes refer to her being laid off from the Radford Arsenal, and subsequently seeking other employment and possibly going back to school. (R. 136, 138) At the same time, Dr. Dow's medical records note Prim's "very complex and stressful social situation," (R. 143), and he diagnosed her with "major depressive disorder, moderate to severe, recurrent," (R. 146), and anxiety disorder. (R. 146) Dr. Dow determined Prim's global assessment of functioning ("GAF") at 59.[2] Dr. Dow prescribed a variety of psychotropic medications and strongly recommended individual therapy for Prim. (R. 137) In May and July, 2004, Prim sought some respite from her multiple stressors by checking herself into the shelter at the Women's Resource Center of the New River Valley. While the notes from this entity are sketchy, they do reflect that Prim came to the shelter to seek rest from the circumstances of her depression and anxiety. (R. 196) One of Prim's visits to the shelter during this period indicate that she was so upset that she broke all of the windows out of her trailer. (R. 195)

---

[2] A GAF of 59 falls in the range between 51snd 60, indicating moderate symptoms (e.g.., flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers).

7

A year later, Prim was seen by Dr. Neil P. Dubner, whose notes reflect Prim's depression and anxiety over a variety of financial and social problems and the substantial stress she felt due to her responsibilities to various family members. (R. 152-58) To the extent that they are legible, Dr. Dubner's notes appear to make no comment on Prim's functional limitations or ability to work, apart from listing GAF values ranging from 48 to 52.[3] During this period, Dr. Dubner referred Prim for admission to Carilion St. Albans Behavioral Health hospital "because of severe depression with inability to cope and thoughts of suicide." (R. 186-92) The hospital records from Prim's admission indicate that her chief complaint was "I'm just over-tired. I have so many responsibilities at home." (R. 188) By the end of her three day stay, Dr. Hal G. Gillespie noted that Prim was much improved. (R. 186)[4]

The Disability Determination Service of the Virginia Department of Rehabilitative Services referred Prim to Robert W. Smith, Ph.D., for a psychological evaluation, which was conducted on July 8, 2005, a month after her Carilion St. Albans hospitalization. (R. 159-67) Dr. Smith's report describes in great detail the multiple stressors impacting Prim. Dr. Smith pegged Prim's GAF at 50, and his diagnostic impression was as follows:

> Mrs. Prim reported numerous symptoms of both Major Depression and Mania. I have no reason to disagree with the previous discharge diagnosis from Carilion Hospital of Bipolar Disorder Mixed, Without Psychosis. Mrs. Prim also experiences a great deal of anxiety, which I believe is a product of her current life

---

[3] A GAF of 41-50 indicates serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job).

[4] It is worth noting that there is nothing in the notes of Prim's hospital admission which is consistent with her physical complaint of uncontrollable diarrhea. None of the three detailed hospital notes mention diarrhea. Dr. Gillespie's discharge note refers to Gastroesophageal Reflux Disease, but indicated it was controlled under treatment. (R. 187) A consulting physical examination done by Dr. Cleve R. Sinor on June 8, 2005 notes no problem with uncontrollable diarrhea. In his history, Dr. Sinor noted "[s]he denies any cough, does have occasional chest pain, no shortness of breath., no fevers or chills, no nausea or vomiting. Does have diffuse abdominal pain at time, no dysuria or change in bowel habits. The patient is mostly concerned about her headaches." (R. 191)

8

circumstances, therefore I offer a diagnosis of Adjustment
Disorder, with Anxiety, Chronic.

(R. 165) At the same time, Dr. Smith's report contained a functional assessment, which placed Prim primarily in the "Good" range, which was defined on that form as "limited but satisfactory." (R. 166) In three categories, "Maintain attention and concentration," "Ability to maintain personal appearance," and "Ability to demonstrate reliability," Dr. Smith listed Prim as either "Good to Fair" or "Fair" (defined as "seriously limited, but not precluded."). (R. 166) As regards attention and concentration, Dr. Smith noted "Mrs. Prim has reported that she has experienced trouble concentrating on tasks at work, because of her constant worry about family members. Concentration difficulties were not observed during this interview." (R. 166-67) Concerning reliability, "Mrs. Prim reported being fired from her most recent job, because of missing too many days of work." (R. 167)

Two months later, a Mental Residual Functional Capacity Assessment and Psychiatric Review Technique were performed by Dr. Hugh Tenison, who found Prim markedly limited in no categories, moderately limited in a few, and not significantly limited in the bulk of the functional areas. (R. 168-170) Dr. Tenison listed Prim as moderately limited in the areas of understanding detailed instructions; carrying out detailed instructions; maintaining attention and concentration for extended periods; working without interruptions from psychologically based symptoms; accepting instructions and criticism; and responding to changes in the workplace. (R. 168-69) In his Psychiatric Review Technique, Dr. Tenison noted mild functional limitation in Prim's activities of daily living and maintaining social functioning and moderate limitations in maintaining concentration, persistence or pace. (R. 182) Dr. Tenison's assessment was subject to reconsideration by Dr. Louis A. Perrott and was affirmed on January 6, 2006. (R. 172, 184-85)

9

Finally, Prim was seen for anxiety and depression by a counselor, Andrew G. Burns, M.S., during April and May, 2006. As with many of the other mental health notes in the file, these notes reflect that "the majority of her family and friends appear to rely upon her to accomplish a great deal." (R. 206) The April 13, 2006 note indicates that Prim was caring for her four grandchildren and that the "client is able to recognize a pattern of taking care of others repeatedly, such that she does not attend to her own needs." (R. 205) During her May 1, 2006 counseling session, Prim related that she in the process of gaining custody of one of her grandchildren and was "experiencing increasing stress, especially as her children rely upon her to manage all of their children." (R. 203)

## V.

At the administrative hearing, the ALJ posed a hypothetical question to a VE, and asked whether a person with the mental capacity determined by Dr. Tenison could perform the work previously done by Prim. (R. 248) Without any explanation, the VE opined that such a person could perform all of the jobs previously done by Prim. (R. 249) The VE had earlier categorized the powder helper job at the unskilled level and the nursing assistant and line worker job at semiskilled. The VE also indicated that the powder helper job and line worker jobs were at the medium exertional level and the nursing assistant at the heavy level. Nothing in the VE's testimony addressed the particular job duties of any of these positions which are likely to produce tension and anxiety. See SSR 82-62. Based on this bare bones testimony by the VE, the ALJ concluded that Prim could return to her past relevant work as a powder helper, noting again only that it was an unskilled job performed at the medium exertional level. (R. 26) The ALJ's decision contains no additional information about the requirements of this job, including

10

Case 7:07-cv-00213-mfu   Document 19   Filed 02/13/08   Page 10 of 15   Pageid#: 83

no information about any duties that are likely to produce tension and anxiety, but concludes conclusorily that "[i]n comparing the claimant's residual functional capacity with the physical and mental demands of the job of powder helper, the undersigned finds that the claimant is able to perform the job of a powder helper, as she actually performed this job and as it is generally performed in the national economy." (R. 26)

SSR 82-62 states the policy and explains the procedure for determining a disability claimant's ability to do past relevant work. An ALJ must make findings of fact as to the individual's RFC, the physical and mental demands of the past job occupation, and whether the individual's RFC would permit a return to her past job or occupation. In making this determination an ALJ should carefully consider the following evidence:

> (1) the individual's statements as to which past work requirements can no longer be met and the reason(s) for his or her inability to meet those requirements;
> (2) medical evidence establishing how the impairment limits the ability to meet the physical and mental requirements of the work; and
> (3) in some cases, supplementary or corroborative information from other sources such as employers, the Dictionary of Occupational Titles, etc., on the requirements of the work as generally performed in the economy.

SSR 82-62. The decision of the ALJ must "follow an orderly pattern and show clearly how specific evidence leads to a conclusion." SSR 82-62. "In addition, for a claim involving a mental/emotional impairment, care must be taken to obtain a precise description of the particular job duties which are likely to produce tension and anxiety, e.g., speed, precision, complexity of tasks, independent judgments, working with other people, etc., in order to determine if the claimant's mental impairment is compatible with the performance of such work." SSR 82-62. Plainly, neither the VE's testimony nor the ALJ's decision contains this

11

level of specificity regarding the powder helper job. In fact, the only details provided are that it is an unskilled, medium exertion job. (R. 26, 247-48)

The Commissioner argues that SSR 82-62 is met by the ALJ's reliance on the expert opinion of the VE. Simply relying on the conclusory testimony of a vocational expert, however, does not adequately develop the record sufficient to satisfy the standard contemplated by SSR 82-62. While the Fourth Circuit has never directly addressed the precise issue of whether reliance solely on testimony from a VE is sufficient under SSR 82-62, other circuits have held that it is not.[5]

For example, the Tenth Circuit, in <u>Winfrey v. Chater</u>, 92 F.3d 1017, 1025 (10th Cir. 1996), held that substantial evidence does not exist when an ALJ simply delegates his fact finding responsibilities to a VE. The court reasoned that [r]equiring the ALJ to make specific findings on the record at each phase of the step four analysis provides for meaningful judicial review. When, as here, the ALJ makes findings only about the claimant's limitations, and the remainder of the step four assessment takes place in the VE's head, we are left with nothing to review." In <u>Winfrey</u>, the court noted that the ALJ "made no inquiry into, or any findings specifying, the mental demands of plaintiff's past relevant work, either as plaintiff actually performed the work or as it is customarily performed in the national economy." <u>Id.</u> at 1024. The court also noted that the "practice of delegating to a VE many of the ALJ's fact finding

---

[5]In <u>Smith v. Bowen</u>, the Fourth Circuit held that an ALJ could not illicit testimony from a vocational expert at step four of the sequential analysis as a vocational expert could only be utilized at step five under the regulations. 837 F.2d 635, 637 (4th Cir. 1987). The holding in <u>Smith</u>, however, has been superseded by statute. See <u>Daniels v. Astrue</u>, 2007 U.S. Dist. LEXIS 53041, 17-18 (W.D. Va. 2007) ("In response to <u>Smith</u>, the Social Security Administration, ("SSA"), on July 16, 1990, published Acquiescence Ruling 90-3(4), to reflect the holding in <u>Smith</u> in all cases arising in the Fourth Circuit. However, in August 2003, the SSA rescinded AR 90-3(4), effective September 25, 2003, stating that it had amended HN720 C.F.R. §§ 404.1560(b), 416.960(b) to clarify that the SSA may use the services of a vocational expert, vocational specialist or other vocational resources at step four of the sequential evaluation process. That being the case, the social security regulations have superseded <u>Smith</u>.").

12

responsibilities at step four appears to be of increasing prevalence and is to be discouraged." Id. at 1025. The court in Winfrey reversed and remanded the decision of the Commissioner because the ALJ's failure to adequately develop the factual record at step four of the analysis did not constitute substantial evidence. Id.

Similarly, the Ninth Circuit in Pinto v. Massanari, 249 F.3d 840, 847 (9th Cir. 2001), reversed and remanded the step four determination of the ALJ because of an insufficiently developed factual record. In Pinto, the ALJ determined that the claimant could return to her past relevant work based on the testimony of a VE, but did not make specific factual findings on the record as to how the claimant's physical and mental limitations would allow her to perform her previous work. Id. at 846-47. The Ninth Circuit, like the Tenth Circuit, noted the absence of meaningful judicial review when the ALJ simply abdicates his SSR 82-62 fact-finding responsibilities to a VE and fails to adequately develop the record. Id. ('Because the ALJ made very few findings and relied largely on the conclusions of the vocational expert, it is difficult for this court to review his decision.")

The Sixth Circuit, in Bailey v. Commissioner, 1999 U.S. App. LEXIS 1621, 14 (6th Cir. 1999), also held that while "the conclusory statements and characterizations of vocational experts are helpful, they do not rise to the level of substantial evidence" for the purposes of determining that a claimant can return to her previous work at step four. The court noted that SSR 82-62 requires detailed and careful analysis of the claimant's physical and mental limitations, the mental and physical requirements of the claimant's past work, and the ability of the claimant to perform the past relevant work given her mental and physical limitations. Id.

13

Simply relying on the conclusory testimony of a VE at step four does not constitute substantial evidence and necessitates a remand. Id. at 16.

Here, much like in Winfrey, Pinto, and Bailey, the ALJ failed to develop the factual basis for determining that Prim could return to her previous work. The ALJ's conclusory determination that Prim could return to her past relevant work as a powder helper is devoid of the specificity and careful analysis delineated by SSR 82-62. Relying solely on the VE's testimony is insufficient under SSR 82-62, precludes meaningful judicial review, and does not rise to the level of substantial evidence. Heeding the requirements of SSR 82-62 is particularly apt in this case, given the fact that the job the ALJ concluded she could return to was **a powder helper in a munitions plant**. Considering the evidence concerning Prim's psychological state, including her attempts at suicide by closing her eyes while driving, the episode where she became so enraged as to break out of the windows in her trailer and her psychiatric hospitalization, one would think that the VE and ALJ would do more to assess the "particular job duties which are likely to produce tension and anxiety," SSR 82-62, of the job in a **munitions** plant beyond a rote recitation of the skill and exertional categorization of such a job. SSR 82-62 and the facts of this case require more than the stochastic conclusion reached here. Because the decision of the ALJ is not supported by substantial evidence, this case must be reversed and remanded for further development of the particular job duties of a powder helper in a munitions plant which are "likely to produce tension and anxiety, e.g., speed, precision, complexity of tasks, independent judgments, working with other people, etc." as required by SSR 82-62.

## IV.

Considering the evidence in the administrative record as a whole, the court finds that the Commissioner's decision does not meet the substantial evidence standard. The decision of the ALJ must be reversed and remanded as he failed to sufficiently develop the factual record at step four of the analysis under the dictates of SSR 82-62. This failure constitutes an error of law and necessitates remand for further development of whether Prim's mental limitations preclude her from returning to her past relevant work. As such, Prim's motion for summary judgment must be granted.

The Clerk of Court hereby is directed to send a copy of the Memorandum Opinion and accompanying Order to all counsel of record.

**ENTER:** This 12th day of February, 2008.

Michael F. Urbanski
United States Magistrate Judge

15